RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DEREK BLOCK,

        *Plaintiff,*

KENNETH M. MILLER; HOUSE OF GLUNZ, INC.,

        *Plaintiffs-Appellants,*

    *v.*

JAMES V. CANEPA, Superintendent of Liquor Control,
Ohio Division of Liquor Control,

        *Defendant,*

DAVE YOST, Attorney General of Ohio,

        *Defendant-Appellee,*

WHOLESALE BEER & WINE ASSOCIATION OF OHIO,

        *Intervenor Defendant-Appellee.*

No. 25-3305

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-03686—Sarah Daggett Morrison, Chief Judge.

Argued: February 24, 2026

Decided and Filed: May 6, 2026

Before: MOORE, CLAY, and MATHIS, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** James A. Tanford, EPSTEIN SEIF PORTER & BEUTEL, LLP, Indianapolis, Indiana, for Appellants. Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee Dave Yost. **ON BRIEF:** James A. Tanford, EPSTEIN SEIF PORTER & BEUTEL, LLP, Indianapolis, Indiana, for Appellants. Michael J. Hendershot, Mathura J. Sridharan, Kaitlyn M. Kachmarik, Samantha V. Rupp, OFFICE OF THE

OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  Martha Brewer Motley, Emily J. Taft, Maxwell H. King, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Intervenor Appellee.  Sean O'Leary, O'LEARY LAW AND POLICY GROUP, LLC, Chicago, Illinois, John C. Neiman, Jr., MAYNARD NEXSEN PC, Birmingham, Alabama, Frederick R. Yarger, William P. Sowers, Jr., WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for Amici Curiae.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Plaintiffs Kenneth M. Miller and House of Glunz, Inc. challenge the constitutionality of Ohio liquor laws preventing out-of-state wine retailers from shipping wine directly to Ohio consumers, Ohio Rev. Code §§ 4301.01(A)(2), 4301.58(C), 4303.12, 4303.25, 4303.236(B)(1), 4303.27 (the "Direct Ship Restriction"), and prohibiting individuals from transporting more than six bottles of wine into Ohio during any 30-day period, *id.* § 4301.20(L) (the "Transportation Restriction").  On appeal, Plaintiffs challenge the district court's holding that the Restrictions are constitutional.  For the reasons set forth below, we **REVERSE** the district court and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

Plaintiff Kenneth Miller is an Ohio resident who wants to be able to order wine directly from out-of-state retailers and to personally transport wine he buys outside of Ohio back into the state.  Plaintiff House of Glunz is an Illinois retailer that wants to be able to ship wine directly to Ohio consumers.  Ohio law, however, prohibits out-of-state retailers from shipping wine directly to Ohio consumers (the "Direct Ship Restriction") and prohibits Ohio residents from personally transporting more than six bottles of wine into the state during any thirty-day period (the "Transportation Restriction").  Miller and House of Glunz thus filed suit alleging that the Direct Ship and Transportation Restrictions impermissibly discriminate against out-of-state businesses in violation of the Commerce Clause.

The procedural and factual background relevant to this appeal is set forth below.

### 1. Ohio's Liquor Laws

Ohio, like many states, has a three-tier system for regulating the sale and distribution of alcohol. In a three-tier system, the state separates the entities involved in the distribution of alcohol into three distinct tiers: alcohol manufacturers (tier one); wholesale distributors (tier two); and retailers (tier three). THREE TIERS AND A TIED HOUSE, OHIO DEP'T OF COM., https://com.ohio.gov/divisions-and-programs/liquor-control/new-permit-info/guides-and-resources/three-tiers-and-a-tied-house [https://perma.cc/RV6N-ACK7] (last visited March 30, 2026). Generally, "the [first] tier makes the [alcohol]" and "sells it to a distributor, who then sells it to a retail location for sale to Ohio consumers." *Id.* The Ohio Division of Liquor Control issues "A" class permits to entities it allows to operate as manufacturers, "B" permits to wholesalers, and "C" permits to retailers. *See* Ohio Rev. Code § 4303.01 *et seq.* Generally, entities may not operate across more than one tier—i.e., a manufacturer may not receive a B permit to also act as a wholesaler—and alcohol products must pass through each tier prior to reaching the consumer. *See id.* § 4301.24.

Ohio has also, however, carved out several exceptions that allow wine to reach end consumers without going through the three-tier system. Pursuant to Ohio Revised Code §§ 4303.232, 4303.233, and 4303.236, both in- and out-of-state wineries may acquire an S-1 or S-2 permit, which allows them to directly ship up to twenty-four cases, or 288 bottles, of wine a year to each Ohio household without routing those sales through Ohio retailers or wholesalers. Pursuant to Ohio Revised Code § 4303.071, in- and out-of-state wineries may also acquire a B-2a permit to sell wine directly to Ohio retailers without going through an Ohio wholesaler—Ohio does not appear to limit the amount of wine a winery may sell to Ohio retailers. *See id.* §§ 4303.071(A)(3), 4301.24(E)(4) (a B-2a permit holder may operate as a wholesaler). Because wineries can elect to rely on out-of-state "fulfillment warehouse[s]," wine may flow from out-of-state wineries to Ohio consumers without ever coming to rest in Ohio wholesalers' warehouses or on Ohio retailers' shelves. *Id.* § 4303.234(A)(1). Additionally, before 2021, Ohio allowed some out-of-state retailers who were also "brand owner[s]" or "importer[s] of . . . wine" to ship wine directly to Ohio consumers. *Id.* § 4303.232(A)(1), (3) (2011) (repealed 2021) Although Ohio has repealed that portion of the provision and no longer

issues new retail permits to brand owners or importers, out-of-state entities who received permits under the pre-2021 statute are allowed to continue direct-to-consumer shipping.

In this case, Plaintiffs challenge two Ohio restrictions relating to the importation of out-of-state wine into Ohio. The first is the Direct Ship Restriction, which is comprised of several different laws that work together to ban out-of-state retailers from shipping wine to Ohio consumers. Ohio issues a C-2 permit to in-state retailers. Ohio Rev. Code § 4303.12. C-2 permittees may sell and ship wine directly to Ohio consumers, *id.* § 4303.27, using "any means or devices" including common carrier delivery of products consumers purchase on the internet, *id.* § 4301.01(A)(2). And David Yost, Ohio's Attorney General (and the state official responsible for enforcing Ohio's liquor laws) has averred that "retailers located solely outside Ohio cannot obtain a C-2 permit from" Liquor Control, Answer, R. 37, PageID #362, and that without this permit they are prohibited from shipping wine to Ohio consumers, Ohio Rev. Code §§ 4301.58(C), 4301.60, 4303.25, 4303.236(B)(1). Accordingly, in-state retailers may ship wine directly to Ohio consumers, but out-of-state retailers like House of Glunz may not.

Plaintiffs also challenge the Transportation Restriction contained in Ohio Revised Code § 4301.20(L). Section 4301.20(L) prohibits Ohio consumers from transporting more than 4.5 liters, or six bottles, of wine acquired outside of Ohio into the state during any thirty-day period. *Id.* § 4301.20(L). By contrast, Ohio consumers may transport up to twenty-four cases, or 288 bottles, of wine within Ohio so long as they purchased it from an Ohio seller. *Id.* § 4303.236(A).

## A. First District Court Proceeding and Appeal

In 2020, Plaintiffs filed suit under 42 U.S.C. § 1983 against Ohio Attorney General David Yost and other officials who enforce Ohio's liquor code.[1] The Wholesale Beer & Wine

---

[1]Plaintiffs originally sued, in addition to Yost, Superintendent of Liquor Control Jim Canepa, Director of the Ohio Department of Public Safety Thomas Stickrath, and Chairperson of the Ohio Liquor Control Commission Deborah Pryce. The district court found that all of these individuals were immune from suit under the Eleventh Amendment and dismissed the claims against them. Plaintiffs challenged the dismissal of only the Director of the Ohio Department of Public Safety Stickrath on appeal, and we affirmed. *Block v. Canepa*, 74 F.4th 400, 411-12 (6th Cir. 2023). Accordingly, the only remaining Ohio defendant is Attorney General Yost.

Association of Ohio ("WBWAO") intervened as a Defendant.  Plaintiffs' suit asserts that the Direct Ship and Transportation Restrictions "discriminate[] against interstate commerce, protect[] local economic interests, and violate[] the Commerce Clause."  Compl., R. 1, PageID #2.  Plaintiffs seek "a declaratory judgment that the [laws are] unconstitutional and an injunction barring the defendants from enforcing" both laws.  *Id.*

In 2022, the district court granted summary judgment to Defendants after holding that the Direct Ship Restriction constituted a valid exercise of Ohio's Twenty-first Amendment power to regulate the sale of alcohol within its borders.  The district court also found that Plaintiffs lacked standing to challenge the Transportation Restriction.  Plaintiffs appealed, and we reversed the district court's determination that the Direct Ship Restriction was constitutional, holding that the district court had erred in treating this Court's decision in *Lebamoff Enterprises Inc. v. Whitmer*, 956 F.3d 863 (6th Cir. 2020), as creating a per se rule that state restrictions on direct-to-consumer wine shipments by out-of-state retailers were constitutional.  *Block v. Canepa*, 74 F.4th 400, 412-14 (6th Cir. 2023).  We also reversed the district court's determination that Plaintiffs lacked standing to challenge the Transportation Restriction.  *Id.* at 410-11.

We clarified that, to determine if a discriminatory alcohol law is constitutional, courts must apply a test developed by the Supreme Court in *Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019).  Under that test, a discriminatory law will survive a Commerce Clause challenge if (1) it "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground," and if (2) its "predominant effect" is "the protection of public health or safety," rather than "protectionism."  *See id.* at 539-40.  We thus remanded, instructing the district court to weigh the evidence submitted by both parties and then determine how the Restrictions fared under the *Tennessee Wine* test.  *Block*, 74 F.4th at 414.

**B.  Remand and Second Appeal**

On remand, the parties engaged in additional discovery and then again filed cross motions for summary judgment on the questions of whether the Direct Ship and Transportation Restrictions were constitutional.  Before applying the *Tennessee Wine* test, the district court

determined that, because the Restrictions were "trusses supporting . . . the three-tier system," they could not "be excised for review outside that context." *Block v. Canepa*, 771 F. Supp. 3d 1010, 1020 (S.D. Ohio 2025). The district court thus focused its *Tennessee Wine* analysis on the three-tier system as a whole, not on the specifically challenged provisions. *See id.* at 1021-24.

The district court determined that Defendants had presented evidence showing that the three-tier system could be justified as a public health and safety measure because it allows Ohio "to keep close watch over the movement and sale of wine throughout the state" and to "control alcohol prices, including by efficient collection of an excise tax at the wholesaler lever [*sic*]." *Id.* at 1021-22. It also determined that the evidence submitted by Plaintiffs was insufficient to impeach or significantly undermine the health and safety justifications offered by Defendants, and thus concluded that the predominant effect of both Restrictions was not protectionism, but the protection of the public health and safety. *Id.* at 1023-24. Accordingly, the court held both Restrictions constitutional and again granted summary judgment to Defendants. *Id.* at 1024. Plaintiffs appealed.

## DISCUSSION

### Standing

Before reaching the merits of Plaintiffs' challenge, we address standing. *See Kitchen v. Whitmer*, 106 F.4th 525, 533 (6th Cir. 2024) (We "must resolve a threshold jurisdictional issue like standing before reaching the 'merits' of a case."). Defendants advance several different arguments as to why Plaintiffs lack standing to challenge both the Direct Ship and Transportation Restrictions. Although Defendants raise some of these arguments for the first time in this appeal, "standing is jurisdictional," so "we may address it at any point in the proceedings." *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 813 (6th Cir. 2012). We review questions of standing *de novo*. *In re Cannon*, 277 F.3d 838, 852 (6th Cir. 2002).

To establish standing, a plaintiff must show that it (1) suffered an "injury" that is (2) "fairly traceable to the challenged action" and that is (3) "redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). All of Defendants' standing

arguments relate to the last element and contend that Plaintiffs' injuries cannot be redressed by a judicial ruling. We disagree and hold that Plaintiffs have standing to challenge both Restrictions.

## 1. Direct Ship Restriction

Defendants first argue that Plaintiffs lack standing to challenge the Direct Ship Restriction. Before addressing the specifics of their arguments, a few words about the methods for redressing a Commerce Clause violation are in order. A federal court may cure a discriminatory injury that violates the dormant Commerce Clause "by either 'leveling up' or 'leveling down'" the restriction. *See Comptroller of Treasury of Md v. Wynne*, 575 U.S. 542, 569 (2015). Leveling up entails extending the withheld benefit to out-of-state interests—in this case that would mean allowing out-of-state retailers to ship wine to Ohio consumers. *See Sessions v. Morales-Santana*, 582 U.S. 47, 72 (2017). Leveling down entails withholding the benefit from both in- and out-of-state interests—in this case that would mean leaving the Direct Ship Restriction intact, but also forbidding in-state retailers from direct-shipping to consumers. *See id.* Either of these alternatives would redress the discriminatory injury inflicted on Plaintiffs by ensuring that there is no disparate treatment between in- and out-of-state retailers. *See Wynne*, 575 U.S. at 569. Although Plaintiffs seek an injunction that would allow out-of-state retailers to ship wine to Ohio consumers (leveling up), "federal courts possess broad discretion to fashion equitable remedies," and it would also be appropriate for the district court to cure their injury by enjoining direct-to-consumer shipping by Ohio retailers (leveling down). *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004). This "partial redress" sufficiently "satisf[ies] the standing requirement." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 716 (6th Cir. 2015).

We now turn to Defendants' standing arguments, beginning with Yost's. As described above in section I.A, Plaintiffs challenge several statutes that, together, form the Direct Ship Restriction. However, they do not explicitly challenge Ohio Revised Code § 4303.35, which requires "holders of [Ohio] retail permits" to purchase the wine they sell to Ohio consumers only from "holders of A or B permits." According to Yost, even if the district court enjoined the enforcement of the Direct Ship Restriction, § 4303.35 would still require out-of-state retailers to obtain all of the wine they ship to Ohio consumers exclusively from sellers located in Ohio

because Ohio issues A and B permits to only Ohio entities.**2** Yost contends that this would make it practically impossible for out-of-state retailers to direct-ship wine to Ohio consumers because it would be economically infeasible for them to buy wine from Ohio only to ship it back to Ohio. Under Yost's theory, this would leave the direct shipping ban de facto in effect, rendering Plaintiffs' injury unredressed.

Yost's argument is unconvincing for several reasons. First, by its own terms, § 4303.35 does not cover out-of-state retailers with no physical presence in Ohio. Section 4303.35 applies to "holder[s] of retail permits," which for wine retailers is a C-2 permit. *See* Ohio Rev. Code § 4303.12. "[R]etailers located solely outside of Ohio cannot obtain a C-2 permit;" thus, if an out-of-state retailer wants to sell wine in Ohio, it must "establish[] a physical facility in Ohio." Answer, R.37, PageID #361-62. Accordingly, § 4303.35 does not regulate retailers like House of Glunz who cannot obtain a C-2 permit because they maintain no physical presence in Ohio. Yost is thus incorrect that, in the absence of the Direct Ship Restriction, § 4303.35 would necessarily apply to out-of-state retailers so as to effectively keep the direct shipping ban in place. Indeed, under the version of Ohio Revised Code § 4303.232 that was repealed in 2021 that did allow some out-of-state retailers to directly ship wine to Ohio consumers, Ohio granted them an S permit to do so, not a C-2 retail permit. *See* Ohio Rev. Code § 4303.232(A)(1), (3) (2011) (repealed 2021).

Moreover, even if Yost is correct that § 4303.35 would apply to out-of-state retailers if the Direct Ship Restriction were enjoined, Plaintiffs' injury would still be redressable. First, the district court could take the leveling down approach and enjoin direct-to-consumer wine shipments by in-state retailers, which would cure the discriminatory injury. Second, the court might also be able to level up and extend shipping benefits to out-of-state retailers by enjoining § 4303.35's in-state purchase requirement. "The power of the federal courts to remedy constitutional violations is flexible . . . [and] [w]here such a violation has been found, the court should tailor the remedy to fit the nature and extent of the violation." *Doe v. DeWine*, 910 F.3d 842, 850-51 (6th Cir. 2018) (alterations in original) (quoting *United States v. Yonkers Bd. of*

---

**2**Note that this contention is not correct because Ohio issues B-2a permits to out-of-state wineries. *See* Ohio Rev. Code § 4303.071(A)(1).

*Educ.*, 837 F.2d 1181, 1235 (2d Cir. 1987)). So even though Plaintiffs did not specifically challenge § 4303.35, it may be within a federal court's equitable powers to enjoin its purchase requirements to the extent it frustrates efforts to cure the constitutional violation. Because there is at least some remedy the district court could issue no matter how one interprets § 4303.35 and its relationship to the Direct Ship Restriction, Yost's standing arguments fail.

Defendant WBWAO argues that Plaintiffs' injuries are not redressable because we lack authority to grant the type of relief that Plaintiffs seek. It claims that because there is no one specific discriminatory statute that we could strike down to cure Plaintiffs' injury, the only way to provide relief would be for us to effectively "order, design, and implement a makeshift exception for out-of-state wine retailers onto the Ohio Revised Code." Appellee WBWAO's Brief at 52. This, according to WBWAO, would constitute "impermissible legislative drafting" that is "beyond the power of an Article III court." *Id.* (quoting *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).

WBWAO is incorrect. The district court here could certainly level down by removing in-state retailers' ability to ship wine directly to consumers. This sort of straightforward revocation of a benefit is well within an Article III court's powers. *See Lebamoff,* 956 F.3d at 876 (acknowledging that any discriminatory injury inflicted by Michigan's wine-shipping restrictions could have been redressed by leveling down the statute). The court may also be able to level up and enjoin the Direct Ship Restriction without overstepping its constitutional bounds so long as it does so in a way that is "faithful to legislative intent.*" Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 331 (2006); *see also Day v. Henry*, 152 F.4th 961, 968 (9th Cir. 2025) (holding that the district court could "[enjoin] the enforcement of the statutory scheme as applied to all liquor retailers and wholesalers inside *and* outside of [the state]."). However, the fact that the district court could level down the statute is enough on its own to satisfy the redressability element. *See Cooper v. USPS*, 577 F.3d 479, 496 (2d Cir. 2009) ("Appellate tribunals have accorded district courts broad discretion to frame equitable remedies for constitutional violations so long as the relief granted is commensurate with the scope of the constitutional infraction." (citation modified)).

Lastly, WBWAO says that Plaintiffs' injuries are not redressable because none of the provisions that Plaintiffs challenge facially discriminate between in- and out-of-state retailers. Their argument appears to be that the lack of facial discrimination makes it impossible for us to redress a facial challenge to the statute. They claim that "because the statutes do not discriminate between in-state and out-of-state retailers in the first place, . . . declaring the challenged statutes unconstitutional and enjoining their enforcement would not redress any discrimination between in-state and out-of-state retailers." Appellee WBWAO's Br. at 50.

WBWAO is correct that the language of the provisions that comprise the Direct Ship Restriction does not explicitly differentiate between in- and out-of-state retailers. But Ohio clearly understands these statutes to authorize direct-to-consumer shipping from only retailers with a physical presence. *See* Answer, R.37, PageID #361-62 (admitting that out-of-state retailers may not ship wine directly to Ohio consumers under the relevant statutes). Indeed, Ohio's liquor permitting laws impose an in-state presence requirement. *See* Ohio Rev. Code §§ 4301.10(A)(6) (Liquor Control must "[c]onduct inspections of liquor permit premises"); 4303.27 (authorizing permit holders "to carry on the business specified at the place . . . described" in the permit); 4303.29(B)(2)(a) (capping the number of retail store permits Ohio issues in each of the state's taxing districts based on that district's population); 4303.292(A)(2)(a)-(d) (Liquor Control may refuse to grant a permit for issues relating to the physical location of a business). Given that Ohio presumes that its laws do not have extraterritorial effect, these location-based regulations contemplate a C-2 permit holder's in-state presence. *See State ex rel. Haavind v. Crabbe*, 151 N.E. 755, 757 (Ohio 1926) ("[T]he laws of a state, generally speaking, have no force beyond the state's territorial limits."). Indeed, in the instances where Ohio's liquor code allows out-of-state entities to sell wine in Ohio without going through Ohio wholesalers, it says so explicitly. *See, e.g.*, Ohio Rev. Code §§ 4303.232(A)(1), (C)(1) (stating that "[i]f the person resides outside this state" and is a wine manufacturer, he may acquire a permit to ship wine directly to Ohio consumers); 4303.233(B)(1), (D)(1) (same); 4303.234(A)(1) (allowing a "person that operates a warehouse that is located outside this state" to fulfill a permitted winery's orders by shipping "wine to personal consumers). Against this backdrop, it is clear that the statutes challenged by Plaintiffs allow direct shipping by only in-

state entities.   WBWAO's contention that the lack of facial discrimination robs Plaintiffs of standing thus fails.

Accordingly, we hold that Plaintiffs have standing to challenge the Direct Ship Restriction.

## 2. Transportation Restriction

Defendant Yost also argues that Plaintiffs' challenge to the Transportation Restriction is not redressable because the statute containing the Restriction, Ohio Rev. Code § 4301.20(L), is an exception to Ohio's blanket ban on transporting any wine into the state.  This total prohibition is contained in a separate and unchallenged provision, § 4303.25.  According to Yost, if we enjoin § 4301.20(L), which allows a consumer to bring six bottles of wine into Ohio, § 4303.25's total ban would remain intact and forbid consumers from bringing *any* out-of-state wine into the state.  Under Yost's version of events, Plaintiffs' injury would thus be left unredressed.

Yost's argument is misplaced.  He is correct that the redressability element is not satisfied where, "notwithstanding any action [a court] might take" in response to a plaintiff's suit, an unchallenged, overlapping law regulating the same conduct "would remain in place" and inflict the same alleged injury on the plaintiff.  *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010).  But this principle does not apply to the instant case because enjoining § 4301.20(L)'s six bottle limit would cure Plaintiffs' injury, even with § 4303.25 remaining in place.

Section 4303.25 reads, in relevant part:

> No person . . . shall . . . transport, import, or cause to be transported or imported any . . . alcohol in or into this state for delivery, use, or sale, *unless the person has fully complied with this chapter and Chapter 4301* of the Revised Code . . .

Ohio Rev. Code § 4303.25 (emphasis added).  The italicized language instructs that, the general transportation ban notwithstanding, the importation of alcohol is permissible in certain circumstances.   Section 4301.20(L) then clarifies that one of the circumstances in which importing wine is permissible is where a 21-or-above Ohio resident brings wine into Ohio for "personal use and not for resale," and if he brings "not more than . . . four and one-half liters of wine . . . in any thirty-day period."  If we struck down the 4.5-liter limit, § 4301.20(L) would

instead clarify that wine importation is permissible under § 4303.25 so long as the importing consumer is of-age and the wine is "for personal use and not for resale." This would leave consumers free to bring up to 288 bottles of out-of-state wine into Ohio per year, remedying the discrepancies between the amount of out-of-state versus in-state wine a consumer may purchase and transport, thus curing Plaintiff Miller's injury. *See* Ohio Rev. Code § 4303.236(A).

Yost's argument works only if we accept his contention that Plaintiffs' suit necessarily seeks to strike down § 4301.20(L) in its entirety, and not simply the parts of that provision that discriminate against out-of-state retailers. But that framing mischaracterizes Plaintiffs' argument. Throughout this suit, Plaintiffs have clearly limited their challenge specifically to "the provisions in Ohio Rev. Code § 4301.20 *that prohibit[] Ohio residents from personally transporting more than 4.5 liters of wine*," not the non-discriminatory components of the statute. Compl., R.1, PageID #7 (emphasis added). And in any event, federal courts may exercise their equitable power to fashion remedies narrowly if they see fit. *See Coal. for Gov't Procurement*, 365 F.3d at 460 ("[F]ederal courts possess broad discretion to fashion equitable remedies."). In this case, an appropriate and narrow remedy to cure Plaintiffs' injury would be to enjoin only the six bottle limit.

Accordingly, the injury to Plaintiffs inflicted by the Transportation Restriction is redressable, and Plaintiffs thus have standing to challenge the Restriction.

**Constitutionality**

Because Plaintiffs have standing to challenge both the Direct Ship and Transportation Restrictions, we turn to the question of constitutionality. We review the district court's grant of summary judgment to the Defendants *de novo*. *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023). A party is entitled to summary judgment if, based on the record as a whole, there are no genuine disputes of material fact that could lead a factfinder to find for the moving party's opponent. Fed. R. Civ. P. 56(a); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position" is "insufficient" to defeat the moving party's motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

To determine whether the Direct Ship and Transportation Restrictions are constitutional, we need to understand the relationship between the Constitution's Twenty-first Amendment and the Commerce Clause. Section 2 of the Twenty-first Amendment states that "[t]he transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. It "delegates to each State the choice whether to permit sales of alcohol within its borders and, if so, on what terms and in what way." *Lebamoff*, 956 F.3d at 868. According to the dormant Commerce Clause, however, a state law that discriminates "against out-of-state goods or nonresident economic actors" is unconstitutional unless "it is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine*, 588 U.S. at 518 (cleaned up). In short, the Twenty-first Amendment "grants States latitude with respect to the regulation of alcohol" but does not "allow[] the States to violate the nondiscrimination principle" of the dormant Commerce Clause. *Id.* at 533 (cleaned up).

In *Tennessee Wine*, the Supreme Court developed a constitutionality test that balances the latitude of the Twenty-first Amendment with the limits of the dormant Commerce Clause. "A discriminatory state liquor law will survive a dormant Commerce Clause challenge if (1) it 'can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground,' and (2) its 'predominant effect' is 'the protection of public health or safety,' rather than 'protectionism.'" *Block*, 74 F.4th at 413 (quoting *Tenn. Wine*, 588 U.S. at 539-40). The district court applied the *Tennessee Wine* test and concluded the Direct Ship and Transportation Restrictions were valid exercises of Ohio's Twenty-first Amendment authority to regulate alcohol sales within its borders. *Block*, 771 F. Supp. 3d at 1020-24.

We disagree with this conclusion. Based on the record as a whole, and analyzing the constitutionality of the Restrictions under the correct legal framework, we conclude that neither Restriction can be justified as a legitimate health and safety measure. Because the connection between both Restrictions and Ohio's purported health and safety objectives is tenuous or non-existent, the predominant effect of both Restrictions is protectionism. We thus hold the Direct Ship and Transportation Restrictions unconstitutional under the dormant Commerce Clause.

**1. Legal Framework**

We first address the appropriate legal framework for analyzing the Restrictions. The district court determined that the Direct Ship and the Transportation Restrictions were "essential components of Ohio's three-tier system" of alcohol regulation and could not be "excised for review outside that context." *Block*, 771 F. Supp. 3d at 1021, 1024. It thus applied the *Tennessee Wine* test not to each individual Restriction, but to Ohio's three-tier system as a whole. It then concluded that the Restrictions were constitutional by virtue of the fact that they were supposedly essential to Ohio's "unquestionably legitimate" three-tier system. *Granholm v. Heald*, 544 U.S. 460, 489 (2005) (citation omitted); *see Block*, 771 F. Supp. 3d at 1020-1024.

The district court erred in applying this "essential feature" framework. We have clearly held that "a state's alcoholic-beverages law is not automatically valid simply because it addresses a portion of a three-tier system." *Byrd v. Tennessee Wine & Spirits Retailers Association*, 883 F.3d 608, 620 (6th Cir. 2018). This is because The Twenty-first Amendment does not "sanction[] every discriminatory feature that a State may incorporate into its three-tiered scheme." *Tenn. Wine*, 588 U.S. at 535. The Twenty-first Amendment protects features "essential" to "the basic three-tiered model of separating producers, wholesalers, and retailers," but beyond that, "each variation must be judged based on its own features." *Id.*

At the outset, we have little difficulty concluding that the Restrictions are neither basic nor essential components of three-tier systems. Many states with three-tier systems allow both in- and out-of-state wine retailers to ship wine directly to their residents, *see B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 235 (4th Cir. 2022) (Wilkinson, J., dissenting) (identifying eleven states that eschew direct-ship restrictions), so direct-ship restrictions are hardly instrumental to the existence of three-tier schemes, *Tenn. Wine*, 588 U.S. at 535 (concluding that residency requirements are "not . . . essential feature[s] of . . . three-tiered scheme[s]" because "[m]any . . . schemes do not impose . . . any residency requirements"). A state can easily maintain three distinct tiers *and* treat in-state and out-of-state retailers evenhandedly with respect to direct-shipping—the three-tier system remains intact whether the state permits or proscribes direct shipping for both in-state and out-of-state retailers. Transportation limits are likewise not

essential to three-tier systems because they do nothing to help "separat[e] producers, wholesalers, and retailers." *Tenn. Wine*, 588 U.S. at 535.

Thus, contrary to the district court's determination, there is no rule telling courts to use an "essential feature" approach to analyze the Restrictions at issue here. *Lebamoff* merely suggests that it may be appropriate to apply the essential feature framework in some circumstances, depending on the specifics of the challenged law, how vital the law is to the state's three-tier system, and the evidence presented by the parties. *See Lebamoff*, 956 F.3d at 877 (McKeague, J. concurring, joined by Donald, J.) ("Michigan has presented enough evidence, which the plaintiffs have not sufficiently refuted, to show its in-state retailer requirement serves the public health."); *see also Anvar v. Dwyer*, 82 F.4th 1, 10-11 (1st Cir. 2023) ("[T]here is nothing inherent in the three-tier system . . . that necessarily demands an in-state-presence requirement for retailers."). This is precisely why we previously explained that "*Lebamoff* did *not* hold that direct ship restrictions are always constitutional" and directed the district court to "consider Plaintiffs' evidence *in this case* concerning *Ohio's* Direct Ship Restriction." *Block*, 74 F.4th at 413-14.

In this case, it is clear that neither Restriction is an essential feature of Ohio's three-tier system because Ohio does not actually have a three-tier system with respect to wine.[3] As discussed above in section I.A., Ohio broadly uses a three-tier system to regulate alcohol sold in the state, but has also carved out extensive wine-specific exceptions to the three-tier system. Out-of-state wineries may already directly ship up to 288 bottles to wine to each Ohio household every year and sell an unlimited amount of wine to Ohio retailers without going through a wholesaler. *See* Ohio Rev. Code §§ 4303.071(A)(3), 4303.232(C)(1), 4303.233(D)(1). Fulfillment warehouses located outside Ohio can ship wine, on behalf of a licensed winery, straight to Ohio households. *Id.* § 4303.234(A)(1). And some out-of-state retailers grandfathered into Ohio's retail permit scheme under the pre-2021 version of § 4303.232 continue to make direct wine shipments in the state. These exceptions create

---

[3]We do not suggest that it is always appropriate to use the essential feature approach if a regulation is an essential component of a state's three-tier system. We focus our analysis on the role the Restrictions at issue in this case play in the three-tier system simply because they are non-essential, meaning the essential feature framework is inapplicable.

numerous pathways for out-of-state wine to enter Ohio's market without going through the three tiers—including via direct-consumer shipping. We thus conclude that Ohio does not actually maintain a three-tier system through which "all [wine] passes before reaching consumers." *Lebamoff*, 956 F.3d at 868. The Direct Ship and Transportation Restrictions cannot be essential features of a system that does not exist for wine.

The Transportation Restriction, § 4301.20(L), is also not essential for the additional reason alluded to above: there is no clear relationship between § 4301.20(L) and the regulatory aims of the three-tier system. Ohio's three-tier system regulates how alcohol is "brought . . . to market" and sold in the state. *Lebamoff*, 956 F.3d at 867. Section 4301.20(L), however, does not regulate an activity with a direct relationship to the marketing or distribution-for-sale of alcohol, but rather the transport of alcohol into Ohio "for personal use and *not* for resale." Ohio Rev. Code § 4301.20(L) (emphasis added). Defendants vaguely aver that allowing consumers to bring an unlimited amount of out-of-state wine into Ohio would undermine the state's ability to control the price of wine in Ohio's market. But they provide no concrete evidence demonstrating that wine imported by consumers for personal use actually has this, or any other, effect on wine for sale in Ohio.

Because neither Restriction is essential to Ohio's three-tier system, the district court should have applied this Circuit's normal framework for analyzing the constitutionality of state alcohol laws and considered how each individual Restriction "stacks up against the *Tennessee Wine* test." *Block*, 74 F.4th at 414. Accordingly, we proceed to analyze each Restriction under *Tennessee Wine* on its own terms, not in the context of the three-tier system.

## 2. Direct Ship Restriction

We begin with the Direct Ship Restriction. The parties agree that this Restriction discriminates between in- and out-of-state interests because it allows direct-to-consumer wine shipping by the former but not the latter. *See supra* section I.A. Applying the *Tennessee Wine* test to the Restriction, we ask whether it can be justified on legitimate "health and safety grounds" or whether its "predominant effect" is protectionism. 588 U.S. at 539-40. As we evaluate the evidence in the record, we are guided by the Supreme Court's caution that "'mere

speculation' or 'unsupported assertions' are insufficient to sustain a law that would otherwise violate the Commerce Clause." *Id.* at 539 (quoting *Granholm*, 544 U.S. at 490, 492).

Defendants offer three primary health and safety justifications for the Direct Ship Restriction. They claim that the Restriction ensures that Ohio is able to: (1) physically access wine retailers to perform on-site safety inspections; (2) impose price controls and taxes on wine sold in the state, which in turn promotes temperance; and (3) monitor and curb underage drinking. However, the record as a whole demonstrates that the connection between the Direct Ship Restriction and these purported objectives is tenuous and unsubstantiated, leading us to conclude that the Restriction's predominant effect is protectionism, in violation of the Commerce Clause.

To explain how we reach this conclusion, we walk through each of Defendants' purported health and safety justifications for the Restriction.

### i. Physical Presence Requirement

Defendants contend that the ban on direct-to-consumer shipping from out-of-state retailers is designed to require retailers to maintain a physical presence in Ohio, thus ensuring that Ohio liquor enforcement agents can physically inspect wine sellers for product safety violations. Yost submitted evidence showing that enforcement agents routinely inspect the premises of state-issued alcohol permit holders. Between September 1, 2021, and January 31, 2024, for example, Ohio conducted several thousand inspections and issued 935 notices and 46 citations to alcohol permit holders.

Yost offers one wine-specific instance where the physical presence requirement helped the state enforce its product safety objectives. In 2021, a consumer reported falling ill after drinking "Saint Sadler" wine, and the Division of Liquor Control traced the tainted wine from its Ohio retailer back to an individual in Cleveland who used unsanitary production methods. The Division then confiscated hundreds of bottles of contaminated wine from the manufacturer and retailers across Ohio. According to Yost, "Ohio could not have removed similarly unsafe wine from out-of-state retail shelves as it lacks the power and authority to inspect out-of-state retailers

and to seize unsafe product from their inventory, even if the contaminated wine was intended for sale or shipment to Ohioans." Appellee Yost Br. at 34-35.

The connection this evidence demonstrates between the physical presence requirement and Ohio's purported safety aims is weak. First, Defendants are able to offer only one example, the Saint Sadler incident, where the physical presence requirement helped Ohio root out unsafe *wine*—all of their other examples relate to alcohol in general. The Saint Sadler example is also of limited value: there, an unlicensed in-state producer sold wine he brewed using a home winemaking kit, in direct contravention of Ohio law. This isolated example of an amateur vintner illegally smuggling homemade wine into the stream of commerce sheds little light on health and safety risks stemming from wine sold by professional retailers. Indeed, Defendants are unable to point to a single piece of concrete evidence demonstrating tangible risks stemming from the interstate shipping of wine from professional, licensed retailers—and the fact that Ohio already allows interstate direct-to-consumer shipping from licensed sellers (wineries) suggests that it is safe, "weaken[ing] the public health justifications" for the Direct Shipping Restriction. *Lebamoff*, 956 F.3d at 877 (McKeague, J. concurring, joined by Donald, J.).

Additionally, Defendants' own evidence demonstrates that an in-state presence requirement is not necessary to pursue its product safety aims. *See Tenn. Wine*, 588 U.S. at 540 (concluding that the state's purported health and safety rationales are undermined by the existence of nondiscriminatory alternatives). As discussed above, Ohio already allows wineries to ship large amounts of out-of-state wine into its state. *See* Ohio Rev. Code §§ 4303.071(A)(3), 4303.232(C)(1), 4303.233(D)(1). WBWAO contends that we should discount this glaring exception to the Direct Ship Restriction's presence requirement because "wineries are required to obtain a federal permit and comply with various federal . . . laws," providing "an added layer of accountability not present with retailers." Appellee's WBWAO Br. at 30. Yet Ohio has no qualms about allowing its residents to drink wine shipped straight from out-of-state "fulfillment houses" and "brand owners," even though these entities receive no federal oversight and sit beyond the reach of Ohio inspectors. Ohio Rev. Code §§ 4303.232(A)(1), (3) (2011) (repealed 2021), 4303.234(A)(1). WBWAO, therefore, fails to explain why it is safe for Ohio residents to

drink wine purchased from out-of-state wineries, fulfillment houses, and brand owners, but not retailers.

Furthermore, Ohio law imposes numerous requirements on wineries that allow the state to track the wine entering the state and ensure its safety. Ohio requires these out-of-state wineries to (1) "keep a record of each shipment of . . . wine that [it] sends to a personal consumer," (2) "provide a copy of each . . . wine shipment invoice to the tax commissioner" that "include[s] the name of each personal consumer that purchased . . . wine from the" winery, (3) provide an annual report to the Division of Liquor Control that "include[s] the name and address of each personal consumer that purchased . . . wine" from the winery and the amount they purchased, and (4) "notify a personal consumer of any health or welfare recalls of the . . . wine" they purchased. *Id.* §§ 4303.232(C)(3)(a)-(c), 4303.233(D)(3)(a)-(c) (same). The law also requires that all out-of-state wineries shipping wine into Ohio comply with the permitting and licensing requirements for wine manufacturers in their home states. *Id.* §§ 4303.232(A)(1); 4303.233(B)(1). In short, Ohio has shown that it is possible to track out-of-state wine sold in Ohio and regulate its safety without requiring an in-state presence. *See Granholm*, 544 U.S. at 492 (noting that "improvements in technology have eased the burden of monitoring out-of-state" entities); *see also Tenn. Wine*, 588 U.S. at 541 ("In this age of split-second communications by means of computer networks . . . there is no shortage of less burdensome, yet still suitable, options" to maintain oversight over alcohol retailers (quotation omitted)). We are thus unconvinced by Defendants' claim that the physical presence requirement is necessary for Ohio to pursue its product safety goals.

WBWAO also argues that Ohio's physical presence requirement enables the state to impose a population-based quota system that restricts the number of alcohol retailers in each Ohio municipality, which promotes temperance. It claims that "[a]llowing out-of-state retailers to ship unlimited quantities of alcohol directly to Ohio consumers" would dramatically increase the supply of alcohol in the Ohio market, thwarting the quota system. MSJ, R.116, PageID #6005. We are not persuaded by this argument for two reasons. First, Ohio currently allows in-state wine retailers and in- and out-of-state wineries to deliver across the state, which already unravels its location-based quota system with respect to wine. Second, Ohio does not need to

allow "unlimited quantities" of wine into its market in order to avoid discriminating against out-of-state commerce.  Just as Ohio Rev. Code § 4303.236 limits the numbers of bottles of wine that wineries may ship to each Ohio household per year, it could institute provisions that prescribe quotas or limits on the amount of wine that retailers may ship to consumers—so long as it applies equally to both in- and out-of-state interests.  *See Granholm*, 544 U.S. at 472 ("[I]n all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994))).  It could also ban direct-to-consumer shipping altogether, which would also cure the discriminatory injury inflicted by the Restriction.

In short, Defendants' evidence does not demonstrate that the physical presence requirement substantially promotes public health and safety.  And to the extent that they draw any connection between the presence requirement and public health, it is clear that there are other non-discriminatory means of achieving those same goals.  We thus conclude that the physical presence requirement is not "reasonably necessary to protect [Ohio's] asserted interest in policing" the amount of wine in the state or the safety of that wine.  *Tenn. Wine*, 588 U.S. at 533.

### ii.  Price Control and Taxation Objectives

Defendants also claim that the Direct Ship Restriction furthers Ohio's health and safety objective of imposing price controls and taxes on wine, which promotes temperance by making wine more expensive to buy.  At each level of its three-tier system, Ohio imposes price controls and excise taxes on alcohol, including wine, to increase retail prices and "prevent aggressive sales practices that improperly stimulate purchase and consumption, thereby endangering the state's efforts to . . . discourage intemperate, consumption of alcoholic beverages."  Ohio Admin. Code 4301:1-1-03(C) (outlining Ohio's minimum price thresholds for wine).

Some states, including Illinois, where Plaintiff House of Glunz is located, impose no price controls on wine and allow for more discount purchase and sale of wine than does Ohio. By way of demonstrating the downstream effects of these price control disparities, Defendants

point to several instances where House of Glunz has sold wine more cheaply than some comparable Ohio retailers.  Defendants insist that direct shipping by retailers from states with weaker price controls would flood the local market with cheap wine, undermining Ohio's temperance objectives.  They claim that direct shipping by retailers risks applying downward pressure on wine prices whereas direct shipping by wineries (currently allowed by Ohio) does not because there are between 400,000 and 640,000 wine retailers in America, but only 5,000 wineries.

We again find these rationales less than compelling.  First, it does not follow purely from the number of out-of-state retailers that Ohio's market will actually be flooded with out-of-state wine absent the Direct Ship Restriction.  Indeed, Plaintiffs' evidence shows that, in states that allow direct shipping by out-of-state wine sellers (retailers and wineries), the total number of out-of-state permit holders ranges from under 50 to, at most, 2,000.  But Ohio can control the number of permits it issues to out-of-state retailers.  And, as described above, Ohio could impose non-discriminatory limits on the amount of wine retailers may ship to avoid flooding the market with cheap wine.

As to Ohio's purported temperance objectives, Plaintiffs' evidence demonstrates that states that allow shipping by out-of-state retailers do not necessarily have higher rates of wine consumption than states that prohibit it—in some states where direct shipping is permitted, wine consumption is higher than in Ohio; in others it is lower.  *See* NIH Consumption Data, R. 52-20, PageID# 3863-66.  And the record does not show an obvious causation or correlation between state laws that allow direct-to-consumer wine shipping and increased wine consumption.  Perhaps some states allow direct shipping because their residents already have a robust culture of wine drinking.  And even Defendants' experts offer no data showing that direct shipping from out-of-state retailers actually reduces the retail price of wine; they merely speculate, without supporting evidence, that direct shipping from states with weaker price controls could "*potentially* result[] in lower prices for products shipped from out of state." Kerr Report, R.53-4, PageID #4317 (emphasis added).  These are the sort of speculative and unsupported assertions that *Tennessee Wine* counsels us to reject.

Moreover, Defendants' narrative about the price control mechanisms Ohio imposes on in-state wine and its ability to impose similar price controls on out-of-state wine is contradicted by Defendants' own evidence.  Defendants insist that the collection of taxes via the three-tier system is essential for keeping the price of wine high and for collecting revenue that the state uses to offset the negative social costs of drinking, but even Defendants' own expert admits that "[t]he Ohio wine tax rate is low." *Id.* at PageID #4318.  Indeed, he is only able to point to three states that have lower tax rates.  This leads us to question Ohio's contention that its excise taxes play a vital role in its wine price controls and revenue generation.  And insofar as Ohio does view taxation of wine as an essential health and safety mechanism, it may impose taxes on out-of-state retailers.  The Ohio laws that currently allow out-of-state wineries to ship wine to Ohio consumers and retailers "all include provisions to ensure the payment of Ohio taxes."  Kerr Report, R.116-1, PageID #6074; *see also* Ohio Rev. Code §§ 4303.071(A)(3), 4303.232(C)(3)(a), 4303.233(D)(3)(a).

We thus conclude that Defendants have presented insufficient evidence showing that the Direct Ship Restriction is necessary for Ohio to achieve its purported objectives of promoting temperance by controlling the price of wine and collecting taxes from its sale.

### iii.  Underage Drinking

Lastly, Defendants argue that the Direct Ship Restriction curbs underage drinking because minors are able to more easily acquire wine from online sources than in-person retail establishments.  This is the least convincing of all of Defendants' health and safety objectives.  Ohio already allows online ordering and direct shipping of all alcohol products from in-state retailers, as well as the out-of-state entities we have been discussing throughout this opinion.  If Ohio "thinks there is such a risk of underage sales in the state, why expand that risk by allowing online sales" in the first place? *Lebamoff*, 956 F.3d at 878 (McKeague, J., concurring, joined by Donald, J.).  And again, the Ohio laws that currently allow direct-to-consumer shipping "include provisions for . . . avoiding underage sales."  Kerr Report, R.116-1, PageID #6074-75.  For one thing, entities that sell and ship wine to consumers must "make a bona fide effort to ensure that the personal consumer is at least twenty-one years of age."  Ohio Rev. Code § 4303.233(D)(1).  And upon delivery, they must "verify that the personal consumer is at least twenty-one years of

age by checking the personal consumer's driver's or commercial driver's license or identification card." *Id.* § 4303.233(D)(2). If there is a reason that Ohio can implement these controls for laws allowing direct shipping from wineries and in-state retailers, but not for out-of-state retailers, it has not explained what that reason is.

\*\*\*

Because the public health and safety rationales offered by Ohio are questionable and unsupported by convincing evidence, we cannot conclude that the "predominant effect" of the Direct Ship Restriction is the "protection of public health or safety," rather than "protectionism." *Tenn. Wine*, 588 U.S. at 539-40. The majority of Defendants' health and safety justifications are speculative, and the weight of their limited nonspeculative evidence is significantly undermined by the fact that Ohio already allows direct-to-consumer and direct-to-retailer wine shipping by out-of-state wineries. That Ohio allows these wine sellers to access their market demonstrates that the state is still able to pursue its health and safety aims without banning direct shipping.

It is thus clear that the predominant effect of this law is not to ensure the public health and safety, but rather to "deprive citizens of their right to have access to the markets of other States on equal terms," and instead direct them to purchase wine from Ohio retailers. *Granholm*, 544 U.S. at 473. Under *Tennessee Wine*, this sort of protectionism clearly violates the Commerce Clause. We thus hold the Direct Ship Restriction unconstitutional.

### 3. Transportation Restriction

We now turn to the Transportation Restriction contained in Ohio Revised Code § 4301.20(L). As with the Direct Ship Restriction, the parties agree that the Transportation Restriction discriminates between in- and out-of-state interests because it prohibits consumers from transporting more than six bottles of wine acquired outside of Ohio into the state during any thirty-day period. Ohio Rev. Code § 4301.20(L). Conversely, consumers may transport up to 288 bottles of wine they purchased from an Ohio entity. Ohio Rev. Code § 4303.236. We thus proceed to apply the *Tennessee Wine* test to the Restriction.

Defendants have advanced virtually no arguments or evidence demonstrating that the Transportation Restriction itself protects the public health and safety—their entire argument depends on us deciding that the Restriction is constitutional because it is "essential" to Ohio's constitutional three-tier system. But because the Transportation Restriction is clearly not essential to Ohio's three-tier system, which does not exist for wine, we consider the extent to which the Restriction, on its own terms, advances Ohio's purported health and safety objectives of (1) ensuring that wine retailers are physically present in Ohio and available for inspection by Ohio liquor enforcement agents and (2) controlling the amount of wine in the state and the price of wine to promote temperance.

The connection between these stated health and safety objectives and the Transportation Restriction is extremely tenuous. Ohio claims that it wants to ensure that it can inspect all wine being consumed, but with the Transportation Restriction in place, Ohioans can still personally bring up to 72 bottles of uninspected-by-Ohio out-of-state wine into the state every year. Ohio Rev. Code § 4301.20(L). If there is some public safety rationale indicating why it is safe to allow individuals to bring only six bottles of wine into the state every thirty days—but not seven, or eight, or nine, or more—the State has not shown what that is. And more importantly, Ohio allows out-of-state wineries to directly ship up to 288 bottles of wine to each household every year and to ship an unlimited quantity to Ohio retailers. *Id.* §§ 4303.071(A)(3); 4303.236(A). The effect of these statutes is that Ohioans can legally order 288 bottles of wine from a California winery but cannot personally bring home seven bottles from the same winery after road-tripping out west. It would be nonsensical to say that the Transportation Restriction itself actually helps Ohio ensure that it can inspect all of the wine sold in the state when Ohio has other laws that allow far greater quantities of uninspected-by-Ohio out-of-state wine into its market.

The Transportation Restriction also bears little relationship to Ohio's purported price control objectives inasmuch as it regulates the importation of wine into Ohio for personal use, not for resale. Defendants have presented no concrete evidence showing that, without a personal transport limit, Ohio would be flooded with so much out-of-state wine that the price of wine for sale in the state would fall so precipitously as to undermine the state's price control and attendant

temperance objectives.  We thus cannot conclude that the Restriction is "reasonably necessary to protect" any of the health and safety objectives asserted by Ohio.  *Tenn. Wine*, 588 U.S. at 533.

Because the record is virtually "devoid of any concrete evidence showing that the [Restriction] actually promotes public health or safety," we conclude that the predominant effect of the law is not the protection of public health.  *Id.* at 540 (internal quotation omitted).  Rather, the law appears to have the primary effect of deterring Ohioans from buying wine from other states, thus "tilt[ing] the market in favor of in-state retailers."  *Brooks v. Vassar*, 462 F.3d 341, 362 (4th Cir. 2006) (Goodwin, J. concurring and dissenting).  We thus hold the Transportation Restriction unconstitutional.

\*\*\*

Although we remand this case to the district court with instructions to engage in further consideration of the appropriate remedies for the constitutional injuries inflicted by both the Transportation Restriction and Direct Ship Restriction, we also offer some guidance with respect to the appropriate remedy for the Transportation Restriction.  The district court must fashion a remedy that is as "faithful to legislative intent" of the Ohio legislature as possible.  *Ayotte*, 546 U.S. at 331.  Plaintiffs ask that we enjoin the small portion of § 4301.20(L) that caps the number of bottles of wine they may bring into the state at six.  The effect of enjoining the six bottle limit would be to allow Ohioans to transport up to 288 bottles of wine into and in the state regardless of whether it comes from an in- or out-of-state source.  *See* Ohio Rev. Code § 4303.236(A).  This approach appears to hew more closely to legislative intent than does the alternative approach of "leveling down" the Restriction and limiting the number of any type of wine that consumers may personally transport within the state to six bottles.  Ohio Revised Code § 1.50 states that "[i]f any provision of a section of the Revised Code . . . is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable."  Without prescribing this approach for the district court, we suggest that this section of the Ohio Code counsels in favor of an injunction against only the small offending provision of § 4301.20(L), without toying with the separate provision of § 4303.236.  The remedy for the Direct Ship Restriction, however, is more complicated because it is comprised of several

different statutes that work together to form the Restriction, and we do not have enough information before us to provide the district court with detailed guidance as to the remedy. However, we do note that the district court must choose the remedy that adheres most closely to the intent of the Ohio legislature without violating the Constitution, and it should consider the impact of the severability provision in § 1.50 on the appropriate remedy.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's grant of summary judgment to Defendants and **REMAND** this case to the district court with instructions to (1) enter summary judgment for Plaintiffs, (2) declare both Restrictions unconstitutional, and (3) determine the appropriate remedies for the constitutional injuries inflicted by the Restrictions.